IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STEPHEN UTTERBACK,

|  |  |  |
|---|---|---|
|  | Plaintiff, | OPINION AND ORDER |
| v. |  | 11-cv-126-wmc |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, |  |  |
|  | Defendant. |  |

---

Pursuant to 42 U.S.C. § 405(g), plaintiff Stephen Utterback seeks judicial review of an adverse decision of the Commissioner of Social Security, finding him ineligible for Disability Insurance Benefits under Title II of the Social Security Act, codified at 42 U.S.C. §§ 416(I) and 423(d).  Specifically, Utterback argues that remand is required because (1) the ALJ failed to develop the record with regard to a medical doctor's testimony that Utterback might have a somatoform disorder; (2) the ALJ failed to make any finding as to whether Utterback had a severe impairment because of his diagnosis of myofascial pain; and (3) the ALJ impermissibly "played doctor" in finding limitations associated with Utterback's mental health issues without the aid of a mental health expert.  Because the ALJ failed to develop an independent medical examiner's testimony that Utterback may suffer from a somatoform disorder, the court will remand.

FACTS[1]

## I.  Background

Stephen Utterback was born on March 5, 1969.  He applied for Social Security Disability Insurance Benefits ("DIB") on October 17, 2007, claiming that he was unable to work because of the onset of a disabling condition on July 3, 2007, and was still disabled as of the date of his application.  (AR 237.)  Before stopping working, Utterback was employed by the United States Postal Service as a clerk.  His previous work experience included gas station attendant, floorer, construction laborer, and building maintenance.  (AR 274.)

Utterback's claim was initially denied and his request for reconsideration was also denied.  On October 19, 2009, the Administrative Law Judge held a video hearing on the denial of Utterback's DIB claim.  On November 18, 2009, the ALJ issued a written opinion finding that Utterback has not been under a disability within the meaning of sections 216(i) and 223(d) of the Social Security Act from his claimed onset date of July 3, 2007, through the date of her decision.  (AR 17.)  The Social Security Administration Appeals Counsel denied a request for review of the ALJ's decision on October 20, 2010. (AR 8.)  Utterback then filed the present action.

## II.  Medical Evidence

The medical evidence dates back to early 2007.  Over the next four years, Utterback saw a number of different health care providers.  The following summary of his

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. ##8, 8-1 through 8-4.

medical records is organized roughly chronologically.  The following individuals provided most of Utterback's health care treatment during the relevant time period:

- Dr. Joan Montgomery: primary care physician

- Dr. James Banovetz: orthopedic surgeon

- Dr. Timothy Romang: physiatrist

- Dr. Margaret Anderson: pain management specialist

- Dr. Mazin Ellias: pain management specialist

- Sue Schueler-Shevelant: therapist

- Travis Forst: therapist

**A. 2007**

On January 12, 2007, Utterback saw Dr. James Banovetz for upper extremity pain.  (AR 557.)   Utterback complained of pain, "which is variable in intensity and location throughout his neck and upper extremities" and "popping of his neck, shoulders, elbows and wrists."  (*Id.*)  That same day, a cervical MRI found a "reversal of the normal cervical lordotic curve at the C5-6 level.  Multilevel central stenosis is present.  There is no definite abnormal signal within the spinal cord and no change in spinal cord caliber. The cervicomedullary junction lies at a normal level."  (AR 370.)  On January 12, 2007, Dr. Banovetz completed a "duty status report" in which he indicated that Utterback could lift 1-5 lbs intermittent for 8 hours per day; sit for 4 hours per day; stand for 4 hours per day; and walk for 4 hours per day.  (AR 776.)

On January 17, 2007, Utterback met with Dr. Banovetz to review the results of the MRI.  The notes from that appointment provide:  "The patient clearly has significant cervical spine disease and I suspect this is the cause of his upper extremity pain."  (AR 556.)  Dr. Banovetz referred Utterback to his colleague Dr. Margaret Anderson "to help manage his conservative care program."  (*Id.*)  In a letter dated February 12, 2007, Dr. Anderson, writing to Dr. Banovetz, stated that Utterback "does have multilevel cervical spondylosis," and that he "has much more diffuse and myofascial component to his pain in my opinion with the underlying spondylosis being potentially a trigger for this."  (AR 770.)   In her report attached to the letter, Dr. Anderson lists as her impression "multilevel degenerative changes of the cervical spine and disc bulging . . . with a superimposed myofascial component to his pain" and likely degenerative disc disease in his lower back.  (AR 773.)

On January 19, 2007, Utterback began physical therapy to address his cervical and lumbar pain and elbow pain.  (AR 639.)  Therapy continued through February 17, 2007.  The therapy notes covering this period reported continued pain.

A second MRI was conducted in February 13, 2007, which found:  "The conus medullaris terminates at the lower L1 vertebral body level and is normal in signal and in contour.  There is mild disc desiccation of L5-S1."  (AR 372.)

On March 22, 2007, Utterback had an initial consultation with Dr. Timothy C. Romang and Donna Leydet, a Certified Physician Assistant ("P.A.-C").  In notes from the visit, Leydet reviewed Utterback's complaints of pain in his upper and lower back, shoulders, elbows and wrists.  (AR 922.)   Leydet noted a number of impressions,

including "chronic paracervical/paralumbar pain," neck pain and low back pain both likely multifactorial, shoulder pain, and diffuse arthralgias. (AR 923.) The treatment plan included referral for steroid injections, various pain medications, and physical therapy. Leydet completed a May 22, 2007, "return to work recommendations record," indicating that "light work" is appropriate, allowing change in position as needed. (AR 936.)

In March 2007, Utterback saw Dr. James Banovetz regarding right shoulder pain. (AR 359.) On March 27, 2007, Utterback had a third MRI of his right shoulder, which revealed a superior labral tear. (AR 374.) Utterback underwent labral repair surgery on April 5, 2007. (AR 461.) On April 18, 2007, Dr. Banovetz completed a "work/activity limitations form" indicating that Utterback could return to work on April 26, 2007, with the restriction that he not use his right arm for one more month. (AR 603.) That same day, Dr. Banovetz also noted that Utterback "is progressing well." (AR 705.)

On May 8, 2007, Utterback saw Dr. Romang for a physiatric follow-up. Dr. Romang reviewed MRIs, and listed "chronic paracervical and paralumbar pain," multifactorial pain in the neck and low back, right shoulder impingement and "diffuse arthralgias with a previous normal rheumatologic workup." (AR 919.) Dr. Romang completed a "return to work recommendations record," noting that Utterback may return to work provided certain limitations, including limiting Utterback to "sedentary work," standing/walking to 4-8 hours, sitting to 5-8 hours, and use of right upper extremity. (AR 935.) Dr. Romang noted that these restrictions should be in place for 8 weeks.

In a progress report dated May 21, 2007, six weeks post-surgery, Dr. Banovetz noted that Utterback "is doing well, and he has no complaints with this." Dr. Banovetz started Utterback on physical therapy and noted that "[w]e are also going to begin workup for his other joints." (AR 547.)

On May 21, 2007, a fourth MRI, this time for right wrist pain, was completed. This MRI revealed, "[g]eneralized changes of the radiocarpal, intercarpal, 1st caprometacarpal and 1st metacarpal phalangeal joint. Underlying etiology is uncertain. Consider chronic repetitive trauma. No acute bony abnormality or acute soft tissue process is identified." (AR 377.) Utterback also had an x-ray of his left wrist completed on May 23, 2007. The radiologist reported that the x-ray revealed "[s]ome early instability of the left wrist probably consistent with some early degenerative disease." (AR 565.) X-rays of his right and left elbows were also taken that day. Once again, the radiologist opined that the x-ray revealed "early degenerative disease." (AR 566.)

Utterback saw Dr. Banovetz on May 23, 2007. In that appointment, Dr. Banovetz diagnosed bilateral wrist degenerative joint disease and bilateral elbow degenerative joint disease based on review of an MRI and x-rays. Dr. Banovetz suggested Utterback switch professions given his "widespread degenerative arthritis." (AR 545.)

On June 26, 2007, Utterback again saw Dr. Banovetz. At that time, Utterback expressed frustration over his continued joint pain: "He asked about being declared permanently disabled, as he feels that if he did not have to work that this would significantly improve his overall pain status." (AR 541.) Dr. Banovetz reported that Utterback's right shoulder was improving, but that he continued "to have quite severe

multiple joint pain." (*Id.*)  Dr. Banovetz recommended a rheumatology consult to understand the underlying etiology. (*Id.*)  Dr. Banovetz also "explained to [Utterback] at this point that [he did] not think we would have enough documentation to declare him permanently disabled." (AR 542.)  Dr. Banovetz completed a "work/activity limitations form," in which he noted a diagnosis of "polyarticular arthritis" and restrictions of "cont[inued] light duty, avoid lifting >5 lbs. occ[asionally], 1 lb. freq[uently].  Avoid repetitive work." (AR 602.)

On July 3, 2007, Utterback saw Dr. Romang for a physiatric follow-up.  Utterback reported that the steroid injections were helping his neck pain and his primary concern was his low back pain.  Dr. Romang diagnosed "multiple musculoskeletal pain conditions attributed to occupations overuse injured while employed by the United States Postal Service" as the primary impressions, and multifactorial pain as secondary impressions. (AR 799.)  On that same day, Dr. Romang completed a "return to work recommendations record" indicating that Utterback is "totally incapacitated at this time.  Patient will be reevaluated on permanent." (AR 807.)

On July 11, 2007, Utterback had an MRI of his left shoulder due to pain.  The radiologist found the following impressions:  "1. Mild acromioclavicular anthropathy with indentation of the myotendinous junction of the supraspinatus.  2.  Downward sloping of the acromion with associated mild chronic supraspinatus.  3. Degenerative signal or small tear of the anterior labrum." (AR 380.)  A radiographic anthogram of his left shoulder completed that same day revealed "essentially normal appearance." (AR 382.)  Utterback met with Dr. Banovetz on July 18, 2007, to review the MRI results.

7

Dr. Banovetz concluded that the MRI revealed "some mild left shoulder impingement and mild early left shoulder degenerative joint disease." (AR 696.) At this visit, Dr. Banovetz gave him a steroid injection for treatment.

At the same time he was receiving treatment from Dr. Banovetz, Utterback was also receiving pain management treatment from Dr. Anderson and Dr. Mazin Ellias. In 2007, between April and August, Utterback received several steroid injunctions in his lower back, in particular his L5-S1 facet joint, in his right wrist, and in his left shoulder. (AR 464; AR 465; AR 470; 540; AR 545; AR 805; AR.)

In one medical note from the pain clinic administering these injections, Dr. Ellias reported that Utterback had some "degenerative changes at both the cervical and lumbar spine" and listed as impressions "1. Cervical radiculopathy with degenerative joint disease of the cervical spine. 2. Myofascial pain syndrome. 3. Lumbar radiculopathy and cervical radiculopathy because of degenerative changes." (AR 467.)

On August 1, 2007, Utterback saw Dr. Shambeel H. Rizvi for a rheumatology consult based on Utterback's diffuse pain all over his body. Dr. Rizvi conducted a physical examination in which he noted full range of motion of lower extremities, no joint swelling, though tenderness in certain spots, normal gait, and normal muscle power, among other observations. (AR 588.) For the assessment, Dr. Rizvi concluded: "1. History of diffuse pain. Rule out myofascial pain syndrome with disability possibly, to be evaluated further by Dr. Ellias. 2. History of osteoarthritis. 3. Rule out any inflammatory etiology." (AR 589.) Dr. Rizvi recommended blood work to rule out any inflammatory etiology. (*Id.*)

Utterback again saw Dr. Banovetz on August 22, 2007.  At this appointment, Utterback specifically complained of pain in his left shoulder and both elbows. Utterback reported that his left shoulder pain "has gotten significantly better," but that "his bilateral elbows remain significantly painful, and he would like to consider injection into these."  (AR 695.)  Banovetz concluded that "[w]e are gradually making progress with patient's joint problem," with a plan of continuing injections and physical therapy. (*Id.*)

On August 28, 2007, Utterback again saw Dr. Romang for a physiatric follow-up. At that appointment, Utterback reported that his "neck pain symptoms are more of a stiffness and dull ache and for the most part are tolerable."  (AR 796.)  Utterback also reported that his right shoulder impingement symptoms were being followed by orthopedic surgery.  He also noted that he had seen a rheumatologist, but that the lab work has been "negative for evidence of rheumatologic disease."  (*Id.*)  At that appointment, Utterback was most concerned about his low back pain.  Dr. Romang's impressions were the same as those disclosed in his earlier progress notes.

On September 26, 2007, Utterback saw Dr. James Banovetz for a follow-up on his joint pain.  At the appointment, Utterback reported that the injection "has given him significant relief, although he is not pain free."  (AR 537.)  Utterback reported that "he continues to have pain in all of his joints, particularly his wrists, elbows, shoulders, back and knees, but he does feel like overall he is a lot better than he was a couple of months ago."  (*Id.*)  The physical exam demonstrated full motion of his shoulders, elbows, wrists and knees, and no point tenderness.  (*Id.*)  Dr. Banovetz further stated that he suspects

Utterback will have some joint discomfort going forward and, if he has any new problems, Utterback should be in touch.  (*Id.*)

In October 2007, Utterback saw his primary care physician Dr. Jean Montgomery for wart removal.  At the October 8, 2007 office visit, Utterback requested a letter to apply for disability.  (AR 786.)  Dr. Montgomery listed "chronic pain" in her assessment and indicated that she would prepare the requested letter.  (AR 787.)

In October 2007, Utterback requested an increase in his service-connected compensation.  As part of that process, he was examined by three independent doctors, each assessing a different aspect of Utterback's condition.  First, Utterback was seen by Kurt C. Euller, Ph.D. for a mental disorder examination.  (AR 1191.)  Euller noted that at the time of the exam, Utterback was "30% service-connected [disabled] for dysthyic disorder and is claiming increased severity of his depression."  (*Id.*)  Euller concluded that the testing suggested severe depression.  (AR 1194.)  As for his ability to work, Euller further concluded that

> [p]sychologically, his depression is such that he probably could work in a situation where he was able to work alone, were it not for his physical disability.  The depression is not sufficient to keep the veteran from working but is sufficient to make work difficult for him in that he would undoubtedly have a difficult time getting along with others.

(*Id.*)

Second, Utterback saw Dr. William Bateman for an evaluation of his joints.  (AR 1195.)  Dr. Bateman focused on Utterback's complaints of right ankle pain and found that his condition "mildly" affected some daily activities.  (AR 1199.)   Dr. Bateman diagnosed Utterback with "djd arthritis" but concluded that this condition was more

likely related to pre- and post-service injuries, rather than service-related trauma or injury.  (AR 1200.)

Third, as part of his request for an increase in his service-related disability, Utterback was evaluated by Dr. Mary Jo Lanska for neurological disorders.  (AR 1200.) Dr. Lanska focused on Utterback's complaints of 24-hour headaches and concluded that these headaches are not service connected.  (AR 1205.)

From July 20, 2007, through October 31, 2007, Utterback attended therapy sessions at Aspirus YMCA Outpatient Therapies for pain in his shoulder joints.  (AR 356.)   The physical therapy records reveal a diagnosis of "shoulder impingement syndrome."   (AR 384.)   An August 1, 2007, an appointment note indicates that Utterback reported that his shoulder pain is improving.  (AR 386.)  An August 29, 2007, report indicated that Utterback was "[t]olerating exercises well.   Reporting very little pain."   (AR 485.)   Similarly a September 2007 treatment note also mentioned that Utterback had met his short-term therapy goals and that he "tolerated treatment well without change in symptoms."   (AR 475, 478.)   Physical therapy was discontinued on October 31, 2007, because "the patient did meet his goals and was returning to an independent home exercise program."   (AR 662.)

On November 5, 2007, however, Utterback restarted physical therapy to address neck pain, shoulder pain, and impingement syndrome.  (AR 729.)   In the notes from that visit, the physical therapist stated that Utterback failed "in the grip strength, lateral pinch, palmar pinch, 9-hold peg test as well as strength for external rotation and wrist flexion,: although in "[a]ll other categories for range of motion and strength" he passed.

(AR 730.)  The purpose of this physical therapy was to test his crossbow strength. Apparently, Utterback wanted a crossbow permit and the form completed by his primary care physician was inadequate.  (AR 783.)

A November 27, 2007, progress note from P.A.-C Leydet summarized Dr. Romang's and her treatment, noting Utterback's diffuse pain and the treatment efforts to date.  (AR 792.)  Leydet specifically mentioned multiple musculoskeletal pain conditions, multifactorial low back pain, chronic multifactorial neck pain, chronic shoulder impingement syndrome, diffuse arthralgias (but rheumatologic workup has been negative), and return-to work issues.  (AR 793.)  Leydet also noted that Dr. Romang and she "are in support of his application for permanent total disability."  (*Id.*)

### B. 2008

Except for mental health treatment at the VA, Utterback's medical records contain no treatment notes for his pain condition for the first six months of 2008.  On June 11, 2008, however, Utterback returned to Dr. Banovetz for multiple joint pain complaints. (AR 1206.)  The physical exam revealed a full range of motion in his shoulders, elbows, wrists and knees, as well as no swelling, no point tenderness, and no instability.  (*Id.*)  Dr. Banovetz concluded that his problems "appear to be more rheumatologic than orthopedic."  (*Id.*)

On June 19, 2008, Dr. Ellias administered a facet joint steroid injection. (AR1014.)  On June 26, 2008, Utterback saw Dr. Ellias for treatment of his neck and low back pain.  (AR 1012.)  At that time, Dr. Ellias administered a cervical steroid injection.

After a several month absence, on November 17, 2008, Utterback again saw Dr. Ellias for treatment of his neck and low back pain. (AR 1007.) Dr. Ellias administered a steroid injection in his cervical spine. In the report, Dr. Ellias listed degenerative joint disease of the cervical spine and cervical radisulopathy, and facet joint dysfunction of the lumbar spine as his impressions. On December 29, 2008, Utterback also saw Dr. Ellias at the pain clinic for treatment of low back pain. (AR 1005.) Dr. Ellias did a radiofrequency ablation and administered a fact joint steroid injection. Dr. Ellias prescribed Lyrica and an anti-inflammatory with Oxycodone to reduce post-operative pain.

In early 2008, Utterback also sought treatment at the Tomah VA Medical Center, mostly for mental health issues. Utterback had been referred by his primary care physician, Dr. Edgardo A. Reyes. (AR 1173.) At the time, Utterback was prescribed Zoloft but the VA medical records reveal that he did not start taking the medication until later that spring. (*Id.*) From January 2008 through March 2009, Utterback saw therapist Sue Schueler-Sheveland, MS, LPC, CSAC, ICS, to discuss issues concerning his pain, compulsive spending, efforts to obtain social security benefits / money issues, and marital problems.

## C. 2009

In January 2009, Utterback began seeing his then primary care physician, Dr. Jean Montgomery, on a regular basis for depression and pain issues. On January 7, 2009, Utterback saw Dr. Montgomery for ongoing pain in his joints, questioning whether he

has fibromyalgia.  Dr. Montgomery found Utterback to have a "markedly depressed mood" and was "struck by his very flat affect."  (AR 954.)  Dr. Montgomery listed loss of weight -- Utterback reported having lost 25 pounds in the previous few months --, fibromyalgia and major depression as her impressions.  She stopped Zoloft and began Utterback on Cymbalta.

On January 16, 2009, Dr. Montgomery found Utterback to be suffering from major depression and again prescribed Cymbalta.  (AR 952.)  She also noted that he had been seeing his counselor at the VA.  On February 2, 2009, Utterback saw Dr. Montgomery for depression.  At that time, Utterback reported that "Zoloft helped a lot more than the Cymbalta."  (AR 950.)  Utterback also reported irritability, in particular with his wife.  Dr. Montgomery's impression was "major depression complicated by compulsive spending."  (*Id.*) She stopped his Cymbalta prescription and started him on Zoloft and Abilify.

On February 17, 2009, Utterback again saw Dr. Montgomery for severe depression.  (AR 947.)  Dr. Montgomery noted that Utterback complained that he could hardly walk, that he is "convinced he is going to be a 'cripple' in one year," and that he is concerned that he has "cancer or HIV or something else."  (*Id.*)  Dr. Montgomery described Utterback as "very tense and sad affect."  (*Id.*)  "He expresses anger towards lots of things, previous physicians, his tenants, his friends, etc."  (*Id.*)  Utterback also complained of lower abdominal pain.  Dr. Montgomery listed depression, unexplained weight loss and chronic pain syndrome as her impressions.  (*Id.*)

14

In 2009, Utterback returned to Dr. Romang for further treatment. On January 15, 2009, Dr. Romang and Donna Leydet saw Utterback for a physiatric evaluation. (AR 905.) Utterback complained of neck pain, tingling in his upper extremities and low back pain. Leydet noted multiple musculoskeletal pain conditions and multifactorial pain among other impressions, and ordered further tests.

On February 26, 2009, Utterback saw Dr. Romang for worsening neck pain. (AR 903.) A follow-up MRI scan was completed on January 21, 2009. The study demonstrated advanced disc degeneration, although Dr. Romang noted that the results were "essentially completely unchanged or actually somewhat improved compared to prior testing." (*Id.*; AR 932.) Utterback also complained of pain at the lumbrosacral junction. (*Id.*) Dr. Romang also obtained a total body scan which was "entirely normal" and an MRI of Utterback's pelvis which was "completely unremarkable." (*Id.*; AR 928; AR 930.) An abdominal CT scan ordered by Dr. Montgomery was "essentially unremarkable," except for potential tiny cysts involving the kidneys. (*Id.*, AR 971.)

On February 26, 2009, Utterback saw Dr. Ellias for follow-up care of both neck and low back pain. (AR 998.) Dr. Ellias advised Utterback to continue with Percocet and Valium, though he also advised him to decrease his dose of Valium. Dr. Ellias also renewed a prescription for Oxycodone and gave him a cervical epidural steroid injection. On March 9, 2009, Dr. Ellias saw Utterback at the pain clinic for neck pain. Dr. Ellias stated, "Unfortunately today he came back with a lot of somatoform disorder," noting his depression and continued pain issues. (AR 992.) Dr. Ellias prescribed conazepam, a

benzodiazepine, to help Utterback sleep and also gave him a steroid injection in his lower back.

On February 27, 2009, Utterback again saw Dr. Banovetz for multiple joint pain complaints.  (AR 1208.)   Dr. Banovetz asked Utterback to choose a few joints for evaluation; Utterback chose shoulders, elbows and wrists.   On physical exam, Dr. Banovetz found full motion of his shoulders, no point tenderness, negative impingement signs, good strength of his rotator cuff, a little lack of extension of both elbows, but "full flexion, full pronation and supination, no effusion, no point tenderness." (AR 1208.)  He also found full motion of both wrists, with no popping or clicking.  (*Id.*)  Dr. Banovetz provided steroid injections in his left elbow and both wrists, and offered to refer Utterback to a neurology consult, but he declined.  (AR 1209.)

That same day, Utterback again saw Dr. Montgomery for follow-up on his labs. (AR 944.)  Dr. Montgomery noted that his CT scan revealed cysts, leading to a diagnosis of possible acquired polycystic kidney disease.  (AR 945.)  Dr. Montgomery also noted that Utterback "is much brighter today and he seems much better than he has in recent times." (*Id.*)

On March 3, 2009, Utterback met with Dr. Montgomery to review a CT scan performed that day to compare it to the February 18, 2009, scan.  Dr. Montgomery noted a finding of cysts in both kidneys.  (AR 969.)  In March 2009, Utterback saw a nephrologist, Dr. Stephen Blonsky, regarding his kidney cysts.  (AR 980; AR 981.)  Dr. Blonsky reported normal labs and that no treatment was necessary at this time.  "[H]e

has borderline criteria by ultrasound for polycystic kidney disease. . . . At this point we will just observe." (AR 980.)

On March 4, 2009, Utterback again saw Dr. Banovetz. (AR 1210.) At that appointment, Utterback stated that he believed he had a terminal illness because of his recent polycystic kidney disease diagnosis. (*Id.*) Dr. Banovetz administered additional injections.

On May 21, 2009, Dr. Ellias saw Utterback for multiple pain complaints, which Ellias opined "fit more or less with a fibromyalgia type of picture." (AR 1049.) Dr. Ellias also noted "a history of somatoform disorder." (*Id.*) For his impressions, Dr. Ellias listed "possibility of somatoform disorder / possible fibromyalgia type of picture" among other pain syndromes. (AR 1050.) He performed a cervical steroid injection to address his pain.

On May 26, 2009, Utterback saw Dr. Montgomery after an 8-week trip to Florida. According to the progress notes, Utterback saw a doctor while in Florida for wrist drop and other complaints. (AR 1021.) Dr. Montgomery noted Utterback's depression and that he continues to have "diffuse aches and pains." (AR 1022.) During the appointment, Dr. Montgomery raised concerns about whether Utterback's Zoloft prescription was sufficient and urged him to see a psychiatrist. She also noted that she thought his weight loss was "psychiatric in etiology." (*Id.*)

In June of 2009, Utterback started physical therapy to address his neck pain issues. The physical therapy notes describe Utterback as being "guarded with all this movements." (AR 1037.) As a general observation, the physical therapist also noted

17

"[u]nsure about the patient[']s efforts with evaluation, he demonstrated increased cervical [range of motion] during conversation and was very limited upon assessment." (AR 1040.)  Utterback missed appointments on June 17, 2009, and June 24, 2009.  (AR 1034.)

At a July 14, 2009, appointment, Utterback was "unsteady walking in, tripping and stumbling."  (AR 1044.)  The notes also mentioned that "[he] could not answer the questions without drifting off to sleep and had a difficult time focusing on the answers." (*Id.*)  Utterback "attribute[ed] his tripping and falling to numbness in his legs, although this is not a new complaint for him."  (AR 1045.)  The physical therapist had Utterback complete a urine toxicology exam which "came back within normal limits today, positive for oxycodone and benzodiazepines," and negative for alcohol.  (*Id.*)  For assessment, the physical therapist listed "1. Cervical radiculopathy.  2. Myofascial pain syndrome.  3. Degenerative joint disease of the lumbar spine.  4.  Possible cervical and lumbar facet joint dysfunction.  4.  Possible overmedicated."  (AR 1046.)  Utterback was not allowed to drive home -- though, he had driven himself to the appointment -- out of concern that he was overmedicated.  Concerns about his possible overuse of Valium were also raised by a Nurse Practitioner at the pain clinic during the June 15, 2009, appointment.  (AR 1048.)

In August 2009, Utterback saw Dr. Ellias for low back and leg pain.  (AR 1227.) Dr. Ellias performed radiofrequency ablation to his lower back.  On October 9, 2009, Utterback again saw Dr. Ellias for neck and low back pain.  (AR 1226.)  Dr. Ellias administered a radiofrequency ablation to the cervical spine.  (*Id.*)  Dr. Ellias listed "1.

Facet joint dysfunction to the lumbar spine with facet joint dysfunction to the cervical spine.  2.  Myofascial pain syndrome.  3.  Depression and deactivation."  (*Id.*)

Starting in May 2009, Utterback began seeing a new counselor Travis Forst on a biweekly basis to address his depression issues.  Initially, Forst noted moderate depression in his notes, but on August 31, 2009, Forst noted that Utterback was severely depressed and suicidal.  (AR 1095.)  On September 2, 2009, Utterback was added to the VA's high risk list for suicidal behavior.  (AR 1093.)  On September 16, 2009, a VA note raised about concern with possible overuse of Percocet.  (AR 1092-93.)

On September 28, 2009, Utterback met with his counselor Travis Forst regarding his depression/ stress.  Utterback discussed suicidal ideations and showed Forst multiple, recent self-inflicted cuts to his arm.  (AR 1091.)  Forst diagnosed dysthymia and depression due to medical concerns.  On October 14, 2009, Utterback met with a suicide prevention coordinator at the VA, following statements he had made to his therapist about cutting himself.  (AR 1090.)

On October 19, 2009 -- the same day as the ALJ hearing -- Utterback saw Dr. Jorge Fernald at the VA for a mental health examination.  Dr. Fernald noted that Utterback was "suicidal without intent."  (AR 1081.)  In examining Utterback, Dr. Fernald noted that Utterback was not cooperative, although willing to participate in the evaluation.  "[P]atient struggles to cooperate as very angry and may be intoxicated."  (AR 1082.)  Dr. Fernald diagnosed Utterback with major depressive disorder and increased his Zoloft dosage and added Trazadone.

On October 20, 2009, Utterback saw David Nash, P.A.-C, for a fall that occurred five days earlier and resulted in right hip pain.  (AR 1078.)  For "active problems," Nash listed "1. DJD neck, lumbar, wrist, knee.  2. Depression.  3. Erectile Dysfunction.  4. GERD.  5. Low Back Pain.  6.  Neck Pain.  7.  Tobacco Use.  8.  MDD Recur, Sev w/o Psychosis.  9.  Kidney, Polycystic.  10.  Fibromyalgia."  (*Id.*)  As part of that appointment, Nash reviewed Utterback's medications and provided education on dosing and administration.  (AR 1079.)

Also in October 2009, Utterback returned to Dr. Banovetz for further treatment. (AR 1212.)  Utterback complained of continued joint pain and reported that he had been diagnosed with emphysema.  (*Id.*)  Dr. Banovetz found no swelling, good strength, and full motion in his evaluation.  He administered a steroid injection in his lower back and into each wrist.  In the second visit, Dr. Banovetz administered injections in his right ankle, left elbow and lower back.  (*Id.*)  At this October 26, 2009, appointment, Utterback complained of recent falls and had multiple scrapes and bruises.  Dr. Banovetz treated his right forearm and both knees and referred him to Dr. Romang to deal with falling and potential mental health issues.  (AR 1215.)

On November 18, 2009, Utterback saw Dr. Romang for physiatric follow-up.  Dr. Romang reported that Utterback "presents today with an incredibly flat affect reporting that essentially every part of his body hurts."  (AR 1223.)  Except for Utterback's complaints of pain to palpation, Dr. Romang's physical examination was normal.  Dr.

Romang recommended Utterback follow-up with Dr. Ellias for "cervical facet rhizotomy via RFA."  (AR 1224.)[2]

## III. Medical Consultant's Assessments

Relying on Dr. Banovetz's September 26, 2007, prognosis and work restrictions as detailed above, Dr. Michael Baumblatt completed a physical residual functional capacity assessment on Utterback on March 13, 2008.  (AR 809.)  The RFC concluded that Utterback could occasionally lift up to 20 pounds; frequently lift up to 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday.  Dr. Baumblatt also concluded that Utterback's ability to push and/or pull was limited in upper extremities, as was his ability to stop and reach in all directions

A "psychiatric review technique" was also completed on March 17, 2008, by Roger Rattan, Ph.D. (AR 817.)  Dr. Rattan found no medically determinable impairment, but checked the boxes for "12.04 Affective Disorders" and "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome[.]"  (AR 817, 820.)  Dr. Rattan explained:  "Alleges depression on his application.  Objectively there is no evidence of any difficulty with depression.  Subjectively he does not report any difficulties with depression to his doctors.  [Activities of daily living] appear to be somewhat limited by his pain disorder, with some irrit[a]bility, but appears to have a wide range of interests and activities."  (AR 820.)  Dr. Rattan found no limitations with

---

[2] On May 6, 2010, Utterback underwent surgery, specifically arthroscopic decompression, labral repair, and distal clavicle resection, of his left shoulder.  (RA 1234.)

respect to the "B" criteria and concluded that the evidence does not establish the presence of the "C" criteria.  (AR 827-28.)

Finally, a mental residual functional capacity assessment was completed on May 19, 2008, by Michael Mandli, Ph.D.  (AR 883.)  Dr. Mandli noted (1) moderate limitations for "[t]he ability to understand and remember detailed instructions;" (2) "[t]he ability to carry out detailed instructions;" (3) "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based systems and to perform at a consistent pace without an unreasonable number and length of rest periods;" and (4) [t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes."  (AR 883-84.)

Dr. Mandli also completed a psychiatric review technique dated May 19, 2008. (AR 887.)  He noted the presence of "12.04 Affective Disorders," "12.08 Personality Disorders," and "depression/dysthymia."  (*Id.*)  The form included a section on Somatoform Disorders, but Dr. Mandli did not check the presence of any of these symptoms.  (AR 893.)  In assessing the "B" criteria, Dr. Mandli noted moderate limitations on "restrictions of activities of daily living" and "difficulties in maintaining social functioning" and mild limitation of "difficulties in maintaining concentration, persistence or pace."  (AR 897.)  Dr. Mandli further found that the "[e]vidence does not establish the presence of the 'C' criteria."  (AR 898.)

**IV. Administrative Law Judge Hearing**

ALJ Wendy Webber held a video hearing on Utterback's claim on October 19, 2009.  In addition to testimony from the claimant, the ALJ also heard testimony from Alanson A. Mason, M.D., an impartial medical examiner, and Susan L. Allison, an impartial vocational expert.  Utterback was represented by an attorney.

At the hearing, Utterback testified as to the reasons he stopped working: "Physically, I have pain 24 hours a day.  I have a headache 24 hours a day.  I can barely squeeze a ketchup bottle.  I can't even play with my dog no more.  When I wake up, I sit in my recliner most of the day.  Probably the most I do is I take walks outside."  (AR 38.) Utterback further described "numbness, tingling, stabbing pains" in his arms and legs. (AR 39-40.)  As for mental health issues, Utterback testified to taking 100 milligrams of Zoloft for depression and five milligrams of Valium for anxiety, seeing two counselors, and being in a suicide intervention program.  (AR 40-41.)   In order to treat his pain, Utterback testified that he is on pain medication and has had steroid injection and radiofrequency ablations ("RFA").

The ALJ called Dr. Mason, a board certified orthopedic surgeon, to testify about Utterback's medical condition.  Dr. Mason reviewed Utterback's medical records but had not personally examined him.  Dr. Mason testified that Utterback has (1) chronic neck pain, likely associated with cervical spondylosis; (2) diffused pain throughout his entire body; (3) polycystic kidney disease and polycystic liver disease; (4) atypical chest pain (without any finding of cardiac abnormalities); (5)  severe depression; and (6) substance abuse issues / smokes a pack of cigarettes a day for many years.  Dr. Mason further

testified that he has been on a number of drugs and undergone a number of steroid injections and RFAs.  While he has generalized pain, Dr. Mason testified that he does not have any motor weakness or neurological deficits.

Critical to plaintiff's challenge here, Dr. Mason went on to testify that Utterback:

> doesn't really fit a category, except he might most closely fit the category of a [somatoform] disorder.[3]  A physical sentence for which there are no demonstrable organic finding but (INAUDIBLE) logical mechanisms.  (INAUDIBLE) severity of the (INAUDIBLE) disorders as met (INAUDIBLE) both A and B are satisfied.  A for a history of normal physical symptoms for several years (INAUDIBLE) beginning before the age of 30, requires the individual to take medicine frequently, see a physician often, all (INAUDIBLE) significantly.  And B would be resulting (INAUDIBLE) the following: marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace.  Repeated episodes would be (INAUDIBLE) duration.  Now, I would say, he might fit that pattern but I'm not a psychiatrist and I shouldn't really -- I don't want to comment further and (INAUDIBLE) discussion that he seems to fit into that pattern.

(AR 45.)[4]  Dr. Mason also testified that signs of a somatoform condition were in existence on the alleged onset day of July 3, 2007, and continue to the present.  (AR 45-46.)  In questioning by the ALJ about somatoform disorder, Dr. Mason again suggested "you need an expert, psychological expert."  (AR 46.)  Ultimately, Dr. Mason concluded

---

[3] The transcript reads "(INAUDIBLE)" before "disorder," but the transcript later clarifies that Dr. Mason was discussing somatoform disorder (*see* RA 46), and defendant does not dispute plaintiff's characterization of the transcript.

[4] Obviously, the quality of the transcript raises concerns, at least with respect to preserving a record, if not as to the quality of the videoconferencing itself.  The court encourages the Commissioner to consider whether this is an anomalous occurrence or whether improvements should be made with respect to preserving the ALJ record in cases involving hearings held via videoconference generally.

that Utterback's depressed status and his subjective generalized pain may limit his ability to function in a work setting, but did not find any physical limitations.  (AR 47.)

Susan Allison, an independent vocational consultant, summarized Utterback's past relevant work, categorizing these work experiences into DOT skill level and exertion level.  The ALJ then asked Allison whether Utterback would be capable of performing past relevant work where there were (1) no physical limitations, (2) no hyper-vigilance required, (3) no interpersonal interactions, and (4) no high production quota or rapid assembly line work.  Allison stated that Utterback would not be able to perform the postal work, but that he would be able to perform his other work -- building maintenance, floor laying and cashier.  The ALJ then added certain physical limitations -- 20 pounds lifting, carrying 20 pounds occasionally, 10 pounds frequently, no limitation on sitting or standing, occasional stooping, and infrequent overhead reaching.  Allison concluded that even with those additional restrictions, Utterback would be able to perform the work of a gas station attendant.

## V. Administrative Law Judge's Decision

On November 18, 2009, the ALJ issued a written opinion finding that Utterback has not been under a disability within the meaning of sections 216(i) and 223(d) of the Social Security Act from July 3, 2007 (the claimed date of the beginning of his disability) through the date of her decision.  (AR 17.)  The ALJ described the procedural history and five-step sequential evaluation process before making certain findings of facts.  The ALJ found that (1) Utterback is a 40-year-old individual with one year of college and past

relevant work as a gas station attendant, floor layer, building maintenance worker, and mail handler; and (2) he meets the insured status requirements of the Social Security Act through December 31, 2012.  The ALJ also found that he had not been engaged in substantial gainful activity since July 3, 2007, the alleged onset date.

Next, the ALJ found the following severe impairments:  "chronic neck pain, diffuse arthralgias, polycystic kidney disease; polycystic liver disease; headaches; depressive disorder; tobacco abuse."  (AR 19.)  The ALJ then found that Utterback "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR, Part 4, Subpart P, Appendix 1."  (*Id.*)  In so concluding, the ALJ further found that the "medical evidence does not document listing-level severity, and no acceptable medial source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination."  (AR 20.)

Specific to mental impairments, the ALJ found that moderate restrictions with respect to daily living and moderate difficulties with respect to social functioning and concentration, persistence and pace.  The ALJ did not find any "marked" limitations., and she did not find evidence to establish the presence of any "paragraph C" criteria.

The ALJ then found that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except lift and carry 20 pounds occasionally; 10 pounds frequently; stand and walk for 6 hours total out of 8 hours; sit for 6 hours out of 8 hours; occasional stooping; frequent overhead reaching with bilateral upper extremities; no hypervigilence required; no intense interpersonal interactions; and no high production, quota or rapid assembly line work."  (AR 21.)  In so finding, the ALJ

26

considered:   (1) whether there was an underlying medically determinable physical or mental impairment or impairments; (2) if the impairment(s) could reasonably be expected to produce the claimant's pain or symptoms; and (3) the intensity, persistence, and limiting effect of such pain or symptoms.  Concluding that the intensity, persistence or limiting effect was not substantiated by objective medical evidence, the ALJ went on to make a finding of credibility based on the entire record.  Specifically, the ALJ reviewed Utterback's testimony regarding his pain, but found his subjective allegations to be exaggerated and not fully credible.   In support, she noted Utterback's history of treatment, including (1) instances of non-compliance, (2) findings by doctors of mild to moderate discomfort where Utterback complained of more significant pain, (3) Utterback's hunting and fishing activities, and (4) Utterback's testimony at the hearing that he suffered from "emphysema, fibromyalgia, incontinence, and that he fractured his hip during a fall the day before" without any medical evidence to support these claims.

Ultimately, the ALJ concluded that:   "[i]n conclusion, the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead.  Nevertheless, the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable."  (AR 25.)  Accordingly, the ALJ found that Utterback "is capable of performing past relevant work as Gas station attendant, DOT 211.462-010, light, unskilled, SVP 2," and that this work "does not require the performance of work-related activities precluded by the claimant's residual functional capacity."  (AR 25.)  Based on these findings, the ALJ concluded that Utterback "has not

been under a disability, as defined by the Social Security Act, from July 3, 2007, through the date of this decision." (*Id.*)


## OPINION

The standard by which a federal court reviews a final decision by the Commissioner is well settled: the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Nevertheless, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision, *id.*, and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When the administrative law judge denies benefits, she must build a logical and accurate bridge from the evidence to her conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Primarily focusing on the first, Utterback raises three challenges to the ALJ's finding of no disability.[5]  First, Utterback argues the ALJ failed to develop the record with regard to Dr. Mason's testimony at the hearing that Utterback might have a somatoform disorder.  Second, Utterback contends the ALJ failed to make any finding as to whether Utterback had a severe impairment because of his diagnosis of myofascial pain.  Third, Utterback contends the ALJ impermissibly "played doctor" in finding limitations associated with Utterback's mental health issues without the aid of a mental health expert at the hearing.  The court addresses each challenge in-turn.

## I.  ALJ's Failure to Develop Record regarding Somatoform Disorder

Somatoform disorders is defined as "[a] group of closely related mental illnesses characterized by distressing physical symptoms that lack a physical cause and arise instead from emotional conflict or anxiety."  American Medical Association, *Complete Medical Encyclopedia* 1142 (2003).  Utterback argues that the ALJ was required to explore evidence that Utterback suffered from a somatoform disorder and, if so, whether this would render him disabled.  Specifically, Utterback points to Dr. Mason's testimony that he "met the listing for a somatoform disorder."  (Pl.s' Br. (dkt. #10) 17.)  His characterization of Dr. Mason's testimony distorts the record a bit.  Dr. Mason did not testify that Utterback met the listing for a somatoform disorder, rather he testified that Utterback "might more closely fit the category of a [somatoform] disorder," but declined

---

[5] At the beginning of his opening brief, Utterback also faults the ALJ for failing to provide limitations of concentration, persistence and pace, but fails to develop this argument.  (Pl.'s Opening Br. (dkt. #10) 2.)  Accordingly, neither will this court.

to comment further because he is not a psychiatrist.  (AR 45.)  Still, Dr. Mason expressed his view that the ALJ needed to consult a psychological expert to further explore this possible diagnosis.

Dr. Mason's suggestion of a somatoform disorder is not the only mention of this possible diagnosis.  Utterback's treating physicians, in particular Dr. Ellias, also suggest a possible somatoform disorder.   On March 9, 2009, Dr. Ellias noted, "Unfortunately today he came back with a lot of somatoform disorder," noting his depression and continued pain issues.  (AR 992.)  Again, in May 2009, Dr. Ellias noted "a history of somatoform disorder."  (AR 1049.)  On the other hand, a psychiatric review completed by Dr. Mandli in 2008 did not note the presence of any symptoms in the section of the form on somatoform disorders.  (AR 893.)

"Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record."  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (citing *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991)); *see also Richards v. Astrue* , 370 Fed. Appx. 727, 731, 2010 WL 1443893, at *3 (7th Cir. Apr. 13, 2010) ("Although an applicant for disability benefits bears the burden of proving that she is disabled, an ALJ may not draw conclusions based on an undeveloped record and 'has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable.'" (quoting *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir. 2004))). "Failure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence."  *Smith*, 231 F.3d at 437 (quoting *Thompson*, 933 F.2d at 586).

Because Utterback was represented at the hearing, whether the ALJ was required to consult with a psychiatrist presents a closer call than a case where the claimant proceeds *pro se*. *See Wilkins v. Barnhart*, 69 Fed. Appx. 775, 781, 2003 WL 21462579, at *5 (7th Cir. June 20, 2003) ("Although an ALJ has the duty to develop a full and fair record, an ALJ is entitled to assume that an applicant represented by an attorney is making his strongest case for benefits." (internal citations and quotation marks omitted)).   Even so, the testimony of an independent medical examiner repeatedly suggesting to the ALJ that she consult with a psychiatrist, coupled with multiple treatment notes in the medical record also suggesting a somatoform diagnosis, is sufficient to create a gap in the record that the ALJ had a duty to explore further. *See Gatewood ex rel. D.P. v. Astrue*, No. 10 C 283, 2011 WL 904864, at *10 (N.D. Ill. Mar. 14, 2011) (remanding where the independent medical expert testified that there was "insufficient evidence for him to reach" certain conclusions, and specifically stating that "[t]he allegation of a mental impairment needs to be developed").   Indeed, this gap is illustrated by the ALJ's *own* assessment of Utterback's credibility:   "the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead."  (AR 25.)

The court will, therefore, remand this case for further consideration of whether Utterback suffers from a somatoform disorder and, if so, whether this impairment or combination of impairments meets one of the listed impairments in 20 CFR, Part 4, Subpart P, Appendix 1, or whether it impacts the ALJ's credibility determination or her

determination that Utterback is capable of performing past relevant work as a gas station attendant.

## II. ALJ's Treatment of Utterback's Myofascial Pain

Myofascial pain syndrome disorder is defined as "a chronic pain disorder.  In myofascial pain syndrome, pressure on sensitive points in your muscles (trigger points) causes pain in seemingly unrelated parts of your body. This is called referred pain." Mayo Clinic Definition, *available at* http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042.  Utterback also contends that the ALJ failed to make any finding as to whether Utterback had a severe impairment of myofascial pain and any corresponding limitation from that condition.  While the ALJ did not specifically mention "myofascial pain," the ALJ did consider impairments of chronic neck pain and diffuse arthralgias (or joint pain) and the medical evidence supporting these impairments.  She also considered Utterback's testimony that he has constant pain in his spine and joints.   Given this record, this is not a case where the ALJ failed to consider certain medical evidence; rather, she simply did not label Utterback's pain condition as "myofascial pain disorder." Accordingly, the court rejects this basis for remand.

## III.  ALJ's Findings of Mental Health Limitations

Finally, Utterback takes issue with the ALJ making certain findings as to limitations on his residual functional capacity assessment without the benefit of a medical examiner on mental health.  (Pl.'s Br. (dkt. #10) 29 (citing *Rohan v. Chater*, 98

32

F.3d 966, 971 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").)  Unlike *Rohan v. Chater*, however, the ALJ did not improperly substitute her judgment for that of a medical doctor.  Rather, relying on the medical record, including a psychiatric review report completed in 2008 by Dr. Rattan, the ALJ developed a residual functional capacity assessment, an administrative responsibility the ALJ is tasked to complete.  *See Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("Residual functional capacity (RFC) is an administrative assessment of which work related activities an individual can perform despite her limitations." (quoting 20 C.F.R. § 404.1545(a))).  Instead, the ALJ here can be faulted for not going far enough in obtaining a complete mental health assessment as to Utterback's possible somatoform disorder.  Accordingly, the court rejects this challenge to the ALJ's decision.

## ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying plaintiff Stephen Utterback's application for disability insurance benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 12th day of March, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

33